BOSTON AND MAINE RAILROAD COMPANY, in equity,

*vs.*

WARRIOR MOWER COMPANY and others.

Penobscot.    Opinion June 4, 1884.

*Contract.    Damages to personal property, rights of special and general owners to.*

A mower company, the owner of a lot of mowing machines, consigned and forwarded them to D, by virtue of a contract under which D was to pay the freight on them and sell them for a specified commission and account to the company for them at a specified price.    *Held:*

1. This contract did not change the title in the machines.

2. D had such special property in the machines as to enable him to maintain an action against a carrier for a wrongful act to the property, in which he would recover, not only his own damages, but such as accrued to the company as general owners.

3. While D might assign his own interest in the judgment to be recovered in such action, he could not assign that which belonged to the general owner.

4. The neglect or refusal of the company to commence and prosecute the action for such damage, is not a waiver of their claim, and they are not estopped from asserting it.

5. A sale of the property after the damage had accrued would not transfer the claim for damages.

6. There can be no division between the company and D, of the damages to be recovered in D's action, until the same have been assssessed.

7. The refusal of the company to prosecute the action makes it equitable that the expenses of that litigation should first be deducted from the judgment recovered, and other expenses, if any, for which D would have a lien, and the balance divided according to their several interests.

ON EXCEPTIONS.

Bill of interpleader, which states on the twenty-first of July, 1877, Daniel M. Dunham brought an action against the plaintiff for damage sustained by the detention of thirty-three mowing machines and a lot of parts. That action went to the law court (*Dunham* v. *B. & M. R. R. Co.* 70 Maine, 164) where it was determined that it could be maintained, and it was sent back for an assessment of damages, and was pending when these proceedings were instituted. In August, 1879, the Warrior Mower Company, notified the plaintiff that the damages to be recovered in such action, belonged to that company. In December, 1879, George W. Dunham notified the plaintiff that action had been assigned to him, and that he claimed the damages that might be recovered in the same. December 17, 1879, Henry L. Mitchell brought an action against Daniel M. Dunham and this plaintiff as the alleged trustee. And the bill alleged that the plaintiff was ready and willing to pay whatever sum might be found due in that action, to such of the parties, if any, as were legally entitled to the same.

This action was referred to referees who were to determine the facts, and present for the decision of the court all questions of law arising upon the facts.

The exceptions were to the *pro forma* ruling of the court, accepting the report of the referees.

(Report of referees.)

" We, the undersigned, referees appointed by the foregoing rule of court, met the parties, agreeably to previous notice at Bangor, on the 21st day of November, 1881, and also on the 22d of said November, and also on the 6th, 7th, 8th, 9th, 10th, 12th days of December, 1881, and also on the 11th, 12th, 13th, 14th, 27th, 28th, 29th days of December, A. D. 1882, and heard their several pleas, proofs and allegations, and we do award and determine, and this is our final award and determination in the premises as follows, to-wit:

" That Henry L. Mitchell, one of the original respondents in this case at the hearing, abandoned all his claim, and he is, therefore, no further to be considered as a party to this case.

"We find that early in March, 1876, the Warrior Mower Company, of Little Falls, in the state of New York, by contract in writing, appointed Daniel M. Dunham, of Bangor, Maine, as agent for sale of the 'Warrior Mower' machines and extra parts of machines for the season of 1876, and said Dunham accepted such agency.

"Said Warrior Mower Company agreed to furnish said Dunham such number of machines and extra parts in good order as said Dunham should call for, for the purpose of selling the same on commission.

"Said Dunham by same contract agreed to use due diligence in endeavoring to sell the same and in maintaining their reputation; also to receive and provide for proper storage for all machines until sold, to pay all freights and charges thereon, and attend to setting up and putting same in successful operation, and to attend to collecting or renewing notes therefor; and to sell said machines for cash or notes, amount payable by purchasers to be paid one-half November 1st, 1876, balance July 1st, 1877, with interest at 7 per cent. and to remit promptly as soon as received to said Warrior Mower Company its proportion of all cash and notes, to report, in full, all machines and extra parts sold on or before the 1st day of September next after the sale, and all machines and extra parts on hand, and to pay all taxes.

"The said Warrior Mower Company, to retain title to all such mowers and extra parts until sold and paid for.

"Said Dunham, for sale of said mowers, was to retain as his commission, a specified part of the retail price of said mowers, and as his commission on extra parts 60 per cent of the regular list prices net at factory.

"The thirty-three mowers detained by Boston and Maine R. R. Co. were :

Eight three feet six inch. mowers, retail price,      $90  00
Seventeen four feet three inch. mowers, retail price, 100  00
Eight four feet seven inch. mowers, retail price,     105  00

"Said Dunham was to retain from these prices as his commission as follows :

For three feet six inch. mowers,                                    $30
For four feet three inch. mowers,                                   30
For four feet seven inch. mowers,                                   32

"The value of the extra pieces detained by the railroad company we find to be $115.90,— 60 per cent of which would belong to said Dunham as commission on sale.

"Said Dunham had been selling such machines and other articles for said Warrior Mower Company for commission, for several years previous, on nearly the same terms as contained in agreement of 1876. By the books of the Warrior Mower Company, there appeared to be due Dunham in April, 1876, the sum of $57.33; but during the next two years, D. M. Dunham was found to be largely indebted to the Warrior Mower Company.

"At the close of business in 1878, the Warrior Mower Company claimed that D. M. Dunham was indebted to the company in the sum of $5887.35, and the books and accounts so shew, but D. M. Dunham claimed that at the end of said season of 1878 the said company were owing him justly an indefinite but very large amount.

"The investigation of this matter involved the examination of numerous witnesses and of very many accounts. We find as matter of fact for the purposes of this case, that at the close of said season D. M. Dunham was owing said company the sum of $5000.

"In the year 1876 said Dunham called the attention of the company to his claim for damage to his business caused by detention of machines, &c., by the Boston and Maine R. R. Co. and recommended that a suit be brought for damages.

"The Warrior Mower Company did not regard with favor any such suit, and neglected and declined to have anything to do with such suit, saying in substance that railroads had so much power and influence that it was hard to fight them.

"In the winter following and later, said Dunham endeavored to get the Mower Company to bring the suit, or assist him in such suit, but the company refused to do so. He then informed the company (W. M.) he should bring such suit; and he did so July 21st, 1877.

" In 1878 Dunham offered to assign the suit to the Mower Company, and stated to them they could get enough out of it to pay his, Dunham's, indebtedness to them but the Mower Company declined the offer and refused to have anything to do with the suit, and made no claim of title thereto till after the opinion of the court in said suit was announced, viz. July 21st, 1879 ; see Maine Reps. Vol. 70, page 164.

" On March 30th, 1878, D. M. Dunham assigned to his son, George W. Dunham, one of the respondents, all his right and interest in said law suit against said Boston and Maine Railroad in part payment for his, G. W. Dunham's, services for the thirty three months preceding the assignment.

" This assignment was duly recorded August 11th, 1879, in Alton, to which town said Dunham had removed.

" There was no controversy as to the length of George W. Dunham's service ; but the value of such services was much in dispute. For the purposes of this case we find the balance due George W. Dunham for such services to have been at date of said assignment, $500.

" In the spring of 1878, about May 18th, by a written agreement of that date, between said Warrior Mower Company and said D. M. Dunham, said Warrior Mower Company took charge of Dunham's agency business, and continued it through the season, and thereafter the business between the Warrior Mower Company, and said Dunham ceased.

"In said agreement of May 18th, D. M. Dunham thereby ' sells, transfers, and assigns to said Warrior Mower Company and its assigns, all his right, title and interest in all stock, implements and tools in the shop (now) then occupied by him in Bangor, also all notes, book accounts and uncollected debts due, or to become due him, also all implements, tools or other property, of any description, belonging to him, that may be elsewhere than in the shop above mentioned, household goods, horses, wagons and harnesses only excepted.'

" It was further provided in said agreement that the Warrior Mower Company was ' to purchase the above designated property

and sell it to what they considered the best advantage and credit the account of D. M. Dunham with the net proceeds.'

" Also ' to sell . . . Warrior Mowers, Randall Harrows and extra parts, and credit the account of said D. M. Dunham with the net proceeds of such sale, over and above the regular wholesale price of such mowers, harrows and extra parts, and to run the shop in such manner as it may seem best, and to credit the above mentioned account with the net proceeds ; also to employ said D. M. Dunham with his team until the season of sales is over and settlement made, and to pay him for such services the sum of fifty dollars per month.'

" We find that the facts of ownership of the thirty-three machines and extra parts detained, when detained by the railroad in July, 1876, were, as set forth in the agreement of March, 1876, and that they were all charged over, by the Warrior Mower Company, to D. M. Dunham when disposed of ; and that they were all disposed of before the close of the season of 1877, and before July 21st, 1877, date of Dunham's writ against the Boston and Maine Railroad.

" The wholesale price of mowing machines, such as were detained, was ten dollars less in 1877 than in 1876.

" We decide as matter of law on the foregoing findings of facts as follows :   .

" 1st. That Daniel M. Dunham, under contract of March, 1876, had such an interest in said detained machines and extra parts as entitled him after their sale, viz. on July 21st, 1877, to bring and maintain action for their detention against the Boston and Maine Railroad.

" 2d. That said D. M. Dunham did not sell and convey to the said Warrior Mower Company his said claim by his agreement and assignment of May 18th, 1878.

" 3d. That if Dunham's said claim against the railroad was included in said sale and assignment of May 18th, 1878, the Warrior Mower Company is estopped to claim it by virtue of their conduct towards Dunham, and their assertions and refusals to him in regard to it, before it was brought and up to the time

the opinion of the court was rendered thereon, that said conduct, assertions and refusals amounted to a waiver of their claim.

"4th. That said D. M. Dunham's claim was duly assigned to George W. Dunham, and that he, said George W. Dunham, is legal owner of the same.

"5th. That if any of our foregoing rulings of law are incorrect so that said Mower Company can have any ownership in said claim in suit, the amount of said Mower Company's claim would be ten dollars on each of the thirty-three machines detained, being $330, and 40 per cent of extra parts valued at $115.90 being $46.36, in all $376.36 (three hundred seventy-six dollars and thirty-six cents), and that George W. Dunham, assignee, should be entitled to the balance of such sum or amount as may be recovered.

"We append hereto a schedule of all the witnesses who testified before us for the several parties, and their fees, and we determine that in case our fourth finding as matter of law is sustained by the court, said George W. Dunham should be paid by said Warrior Mower Company the fees of all his witnesses attending the hearing, except of himself and D. M. Dunham, parties to the suit, viz. the fees of the last eight witnesses named in annexed schedule of witnesses, amounting to $15.80. But if the court shall determine that there is a joint ownership of the claim in suit, between said Warrior Mower Company and George W. Dunham, as is referred to in our fifth finding as matter of law, then each of said parties shall pay his own witnesses.

"Bangor, January 28th, 1863."

*Wilson and Woodward*, for the Boston and Maine Railroad Company.

*Barker, Vose and Barker*, for the Warrior Mower Company.

*H. L. Mitchell*, for D. M. Dunham and George W. Dunham.

DANFORTH, J. Whether this bill is maintainable as an interpleader is a question not now before the court. By the reference the parties have waived such objections as might have been raised to it as such, and the subsequent proceedings may

be considered as a substitute for the interpleader. *Atkinson* v. *Manks*, 1 Cowen, 691. Hence the only questions arising are such as are presented by the exceptions. The rule required the referees to determine the facts and present to the court for decision such questions of law as shall arise thereon. This they have done and the *pro forma* acceptance of their report presents the correctness of their finding in matters of law.

There are several rules of law laid down by the referees, the object of which is to settle, as contemplated in the bill, the ownership of the damages to be recovered in an action now pending for their assessment between the defendant, Daniel M. Dunham as plaintiff, and the complainant in this bill as defendant. The contest over what may be the fruits of that suit, is between the defendants, the Warrior Mower Company on the one hand and George W. Dunham on the other, both claiming as assignees under Daniel M. Dunham, the plaintiff. The referees find that the assignment to George W. Dunham is valid and that there was none to the Mower Co. Whether this latter finding is correct, is immaterial; for, if the validity of the assignments were the only question involved, that to G. W. Dunham is certainly of equal validity with the alleged assignment to the Mower Co. and being of an earlier date would prevail. But the company claims under another and a different title, that of ownership in the property, a wrong to which is the foundation of the action in which these damages are claimed. As the plaintiff in that action could transfer only his own interest in it, it is apparent that if this claim of the company is found valid it must prevail over the assignment. It therefore becomes necessary to ascertain the relative rights of D. M. Dunham and the Mower Co. in the former action.

But the referees find as matter of law that the Mower Co. is estopped to set up such title by virtue of its conduct towards Dunham and by its assertions and refusals to him in regard to the action, both before and after it was brought. This ruling so far as it relates to the claim under the assignment, is clearly correct, for the facts show a refusal to accept such a transfer and without an acceptance it could be of no effect. But under the

other claim of title there is no estoppel. The facts show no deception, no misrepresentation of facts by which the plaintiff was led astray, or placed himself in a position different from what he otherwise would have done, no act or word inconsistent with the assertion of a right on the part of the company. The most that the facts show, was a refusal on the part of the company to assert its claim in the way and manner proposed; no surrender of the claim, no attempt to make any transfer of it to any one. If Dunham had any interest which he could enforce in that action, the company were under no legal or moral obligation to prosecute the action for his benefit; if he had no such interest a refusal by the company would not aid him. Without an interest he could not sustain his suit. That action has by the court been decided in his favor and the measure of damages given.

Ordinarily when a plaintiff sustains his action it is presumed that the whole amount of damages recovered will belong to him. In fact the injury to him or to his property is the measure of the damages. But while this is the general rule there are exceptions, not to the extent or measure of damages, but to the interest the plaintiff may have in them. It is true that an action cannot be maintained unless the plaintiff has an interest in the subject matter of the suit, but he may do so when he is not interested to the full extent of the damages to be recovered. Such are the familar cases of injury to property in which there is a general and special owner, as bailor and bailee, consignor and consignee, principal and factor. In such cases the action may not be brought in the names of the two jointly, but may in the name of either. In the action now in question the subject matter was mowing machines and parts of mowing machines. The damage claimed rests upon a neglect of the carrier by which the property was improperly delayed in its transit. The facts show that the title to the property was in the Mower Company; that it had consigned and forwarded the machines to Dunham by virtue of a contract under which Dunham was to sell them for a specified commission and account to the company for them at a specified price. Dunham was also to pay the

freight. This contract, while it did not change the title in the machines and pieces, gave Dunham such a special property in them as to enable him to maintain the action in his own name, and the consignment and forwarding the property, thus setting it apart and putting it into the hands of the carrier for his benefit, gave him a constructive possession sufficient for that purpose ; and as the injury was a result of a single wrongful act to the whole property the damage could not be apportioned but must all be recovered in that one action, the judgment in which would be conclusive against any suit by the general owner. 2 Redfield on Railways, (3d Ed.) 171 ; Chitty on Pleading, (16th Ed.) 71 ; *Little* v. *Fosset,* 34 Maine, 545 ; *Nesmith* v. *Dyeing Co.* 1 Curtis, C. C. R. 130 ; *Sumner* v. *Hamlet,* 12 Pick. 76 ; *Sewall* v. *Nichols,* 34 Maine, 582 ; *Gowen* v. *Cary,* 1 Abb. (N. Y.) Pr. 285 ; *Wade* v. *Hamilton,* 30 Ga. 450. Hence Dunham, in this suit, is entitled to recover not only his own damages but such as have accrued to the Mower Company as general owners. The measure of damages as held by the court in that case can be applicable upon no other theory. If then Dunham should receive the whole damage recoverable in his suit he would be entitled to retain his own share and the balance he would hold as trustee for the Mower Company. *White* v. *Webb,* 15 Conn. 305 ; *Little* v. *Fosset, supra.*

While Dunham might assign his own interest in the judgment and undoubtedly his assignment to G. W. Dunham would transfer that interest, that which belonged to the general owner he could not assign, for to that he had no title. The first finding of the referees, so far as they hold that Dunham had such an interest in the machines and extra parts, as would enable him to maintain the action, is correct. But so far as they put it upon an acquisition of title by a sale by him and a charging over by the company, it is erroneous. The damages would belong to those who were owners at the time of the injury and a subsequent sale of the machines would transfer no claim to such damages. If it were so Dunham would be divested of his claim as well as the Mower Co. But there was no sale to Dunham. By the terms of the contract he was to account for the machines when

sold.   In the sale he was acting as the agent of his principal and
the contract of sale was not between Dunham as the vendor and
the purchaser, but between the general owner and the purchaser.
The charging over was in effect simply a charging him with the
proceeds in accordance with the contract.   But even this charg-
ing over would not prevent the principal following the proceeds
in the hands of the purchaser who would not be authorized
after notice from the principal to pay the agent any farther than
to the extent of his lien.   *Edmond* v. *Caldwell*, 15 Maine, 340 ;
*Kinder* v. *Shaw*, 2 Mass. 398 , *Kelley* v. *Munson*, 7 Mass.
319 ; *Thompson* v. *Perkins*, 3 Mason, 232 ; *The ship Packet, Id.*
334 ; *United States* v. *Villalonga*, 23 Wallace, 41.

The fifth finding of the referees so far as now appears, would
give the Mower Company all the damages to be recovered, and
perhaps more.   It is in fact too early to make a division of the
fruits of the first suit, for we have not sufficient facts.   The
damages have not yet been assessed and though the court have
given the measure of damages in that suit, which is in accordance
with that established in *Weston* v. *Grand T. R. Co.* 54 Maine,
376, yet as in that case, it must be considered as somewhat
elastic.   The referees speak of Dunham's claim as one of injury
to his business.   If that is all he can prove under the allegations
in his writ it may be that legally he can prove no more than
nominal damage.   This decision rests upon the ground that by
the allegations in his writ he is entitled to recover damages in
accordance with the principle laid down by the court in his suit.
The referees find the damages to the Mower Company alone to
be the difference in the price of the machines when they should
have arrived and their value one year after, or the next season.
This is not the measure established by the court and would very
probably lead to a different result.   If the machines arrived too
late for sale in the season of 1876, so that it was necessary to
keep them over, we might well suppose they would be worth less
when they did arrive than at the beginning of the next season,
especially if the keeping over should be attended with expense.
Again the facts show that the value of the machines was made
up by the commission and the price to be paid to the company

for them but they do not show whether the company received the price according to the contract, or whether Dunham received his commissions and other expenses for which he had a lien in full or in part, or nothing.    All these facts are necessary to be known before a division of the proceeds can be made.

The refusal on the part of the company to prosecute the action, though not an estoppel to its claim to a fair proportion of the fruits of the litigation, does make it equitable that the expenses of that litigation should first be deducted and other expenses, if any, for which Dunham would have a lien and the balance divided according to their several interests.

*Exceptions sustained.*

PETERS, C. J., WALTON, VIRGIN and LIBBEY, JJ., concurred.